Next case on calendar, Frazier v. Superior Court, has been removed from the calendar, so we'll proceed to Yakovich v. Smart & Final. May it please the Court. Good morning, Your Honors. Harley Earhm on behalf of Plaintiffs' Appellants Melinda Craig and Aaron Yakovich. At this time, if I may, I'd like to reserve three minutes of my time for rebuttal. You'll watch the clock. Your Honors, the first issue before the Court is whether the District Judge correctly concluded that the Smart & Final professional oven and grill cleaner was governed by the Federal Hazardous Substances Act, and whether plaintiffs failed to generate a jury question on the defendant's compliance with the FHSA. The FHSA only applies to hazardous household or children's products. We stipulate that this was a hazardous product, and there's been no contention by the defendants that it was a child's product. So the threshold question is whether the grill cleaner could be considered a household product. If it was, then the FHSA preempts plaintiff's common law warnings claims, and plaintiffs are only able to proceed under an FHSA noncompliance theory. The Consumer Product Safety Commission has promulgated a regulation that sets forth a detailed definition of what a household product is under the FHSA. Basically, the test is whether it's reasonably foreseeable under any conditions of the product's use that it will end up in a home. We believe that the professional oven and grill cleaner at issue in this case is not a household product because under no reasonably foreseeable conditions of its use would it end up in a person's home. Linda Campbell, the Carroll Company's Director of Regulatory Compliance, testified in deposition that the only product it manufactures that falls within the purview of the FHSA is a polished product. She also testified that the grill cleaner is intended to be used in a commercial or institutional situation. She considers it a highly specialized industrial product. And Ron Kramer, the Technical Director for Carroll Company, also testified that the grill cleaner is not intended to be nor is it marketed as a household product. Where was it sold? Was it ever sold in a retail? Your Honor, it was sold in a retail store, and I think on that point the Fourth Circuit's decision in Barnes v. Litter and Industrial Products is instructive because in that case the product at issue, which was burning alcohol, was also sold at a retail store. And the plaintiffs in that case actually had evidence that two non-professionals had bought this alcohol. What had happened was some prison inmates had gotten their hands on it at the prison's hospital and had drank it and totally blinded themselves. So they brought an FHSA noncompliance claim, and the district court dismissed it on the grounds that the burning alcohol was not a household product. The Fourth Circuit affirmed under the CPSC's household product regulation, even though the burning alcohol was available through the defendant's retail stores and had actually been purchased by non-professionals. I don't think that the analysis of whether it's a household product can begin and end with how it is sold, whether it's in the retail context, whether it's restricted somehow, because I don't think that's really possible. The better question is who will really buy this product, and who will actually buy this professional oven and grill cleaner for use in the home? Well, what kind of retail outlet was it sold in? The Smart and Final Stores, which... Sort of the warehouse type thing, Costco type. Right, right, Your Honor. And you don't think people go into that as retail customers and buy these big size, oversized, quote, professional use kind of products? I think they do, Your Honor, but I don't think that this product, based on defendant's employees' deposition testimony, is the sort of thing that mom and pop would walk into the store looking for because it's very caustic, very dangerous, and I don't think it's something anybody would want to have around the home because it's not needed. It's meant for an industrial, heavy grease, heavy use cleaning situation, so even though people have access to it, I don't know why anybody would want to buy it except for people in the restaurant industry and such. Even if this could be considered a household product, such that it falls within the scope of the FHSA, plaintiffs still had an FHSA noncompliance theory on the grounds that through the labeling of this product, the defendant still violated the FHSA, and courts have recognized, including this circuit, I believe that there is that theory available to plaintiffs, even if their common law warnings claim is preempted. We believe that the grill cleaner's label violates the FHSA in three main ways. First, it does not contain a complete statement of the product's principal hazards. One of the principal hazards we believe exists is blindness. Plaintiffs did have an expert witness, Gordon Whittaker, who opined, both in deposition and through a report, that blindness was the primary or principal hazard of the grill cleaner. The defendant's own employees, particularly Linda Campbell, agreed with that in deposition as well. Linda Campbell testified that blindness is a severe injury. It's likely to occur because of the high probability of a liquid being splashed in a person's eye, as occurred in this case. And she even went so far as to say that Smart and Final and Carroll Company, but more particularly Carroll Company, would have to consider placing a blindness label on its product, on this grill cleaner. So her own deposition testimony supports Gordon Whittaker's opinions about blindness as a primary danger and corroborates them. Linda Campbell also testified that the principal hazard in this grill cleaner was the sodium hydroxide. And through the record, it's clear that the number one danger of sodium hydroxide, when it comes into contact with an eye, is a severe burn that's most likely going to result very quickly in blindness. Now, the label itself does talk about burning, doesn't it? The label, Your Honor, does mention that it causes severe burns. It does not mention severe burns to what part of the body. It certainly doesn't specify blindness, as opposed to the product's material safety data sheet, which did specify the risk of blindness, but that was never provided to Mr. Yakovich's employer in this case. Wouldn't a warning that mentions severe burns logically mean that if you get it in your eye, you're in big trouble? I disagree, Your Honor, and I think that Linda Campbell, the regulatory director, disagreed with that as well when I took her deposition, because I asked her that question and she said that it would probably be safer to have a specific blindness warning rather than relying on everyday uses of the product to extrapolate the product's hazards from the general contained sodium hydroxide causes severe burns warning, because we don't believe, and neither did our expert witness, that your everyday kitchen worker is going to understand that sodium hydroxide, when it gets in the eye, is going to blind you and not just hurt a little bit, and it's something you can flush out and get some drops and you're going to be fine. So, Your Honor, I do respectfully disagree that the severe burns warning is enough to tell someone that they should keep it out of their eye and wear eye protection. Well, if it says, as it does, avoid contact with skin, eyes, and mucous membranes, you're saying that because it doesn't say may cause blindness, that that's the additional step that needs, or warning that needs to go in there because it's, the average person wouldn't know that if they got something that causes burns and got in your eyes, it could impair your vision? I believe so, Your Honor, and I think that the next step that needs to be taken, and our second criticism of the label, is the statement precautionary measures. Let me ask this, if this had, was there any way, because it goes on to say the treatment is with eyes to flush with water, was there any evidence to suggest that had he flushed the eye with water that that would have prevented blindness in this case? I think the evidence absolutely goes in the opposite direction, Your Honor, because Mr. Yakovitch immediately began flushing his eye and then people jumped in and started helping him flush his eye. He still lost it, he was still blinded, and actually Ron Kramer, the technical director for Carroll Company, testified in deposition that this is instantaneous. Once it gets in your eye, it's in there, and no amount of flushing will help. But we believe that that's the other violation, is the statement of precautionary measures. There was no warning on the bottle itself, unlike in the product's material safety data sheet, to wear eye protection. It did say avoid contact with eyes, but it doesn't tell users how they should avoid contact with eyes, and we think that that is also an FHSA violation. The third area that we're focusing on under the FHSA is its conspicuousness and prominence requirement. Our expert witness, Gordon Whitaker, identified a number of deficiencies that he found with the product label's presentation. Things weren't outlined and separated from other written material. And through deposition, Carroll Company's employees have acknowledged that a number of Mr. Whitaker's critiques of this label do have merit. Well, let's suppose that there may be some dispute about that. As I understand the record, there's a substantial question whether, no matter what they put on, whether either the owner of this restaurant or Mr. Yakovitch actually read or would have reacted to whatever was on there. In fact, that all this occurred, as I understand it, when the grill cleaner had been put back on the shelf and he was done with the vinegar treatment and was moving to leave the kitchen. How would any of this warning material prevent this particular accident? Well, first off, Your Honor, just a quick correction. He actually was not leaving the kitchen. He was putting the vinegar bottle back on the shelf. And somehow or another, the bottle of the grill cleaner fell down, struck a meat slicer, and splashed in his eye. So he wasn't completely done cleaning the grill. He was still very much in the process of doing so. But, Your Honor, I think this is really the third issue. This was next to the vinegar bottle? Same shelf. Same shelf, Judge. But I think this is really the third issue on appeal, and that is the proximate cause argument. Let me just, Clare, because I think I have a concern about that. I'm reading from the transcript at page 72 of Mr. Yakovitch. And he said we had closed the bar and everything was done in the kitchen, as far as cleanup goes, except for the grill, which was generally the last thing we did at the end of the day was the grill and then the floors. I had cleaned the grill with a cleaner the same way I had done every night. And then I was finished with that, had put the vinegar on the grill, was finished with that, was putting the vinegar up on the shelf when, as I put the vinegar up on the shelf, I turned to walk out of the kitchen, and out of the right side of my peripheral vision, I saw something coming off the shelf. Now, in reading that, I interpreted that he was done and he was put it up and he was leaving. Is there evidence to suggest there was more operational things going on, or what is your argument on that? I think there was more, Judge. I think that he was not entirely finished, but I know that passage makes it a little bit unclear. Obviously, if you're talking to him and then his deposition, I've heard a number of different recollections about what happened. But he obviously didn't indicate to me that he was still working back there and wasn't entirely done. What is the evidence of what he was going to do in addition to that? At this point, Your Honor, I can't recall. But I don't know that the use of the product or not is fully dispositive of this question, because the other question is, had there been a warning, would the cleaner have even been in the kitchen? His employer, Andrew Sawyer, the one responsible for purchasing supplies for the restaurant, testified that he did read the warning. He did not know that the product could cause blindness, and if he had, he would have seen if there was a safer product available. And I think that that creates a jury question of proximate cause in that the district court's disregard of Andrew Sawyer's deposition testimony really was a decision of Mr. Sawyer's credibility, which is something that should have been left to the jury, on top of the fact that it was testimony that went to proximate cause, which is almost always for the jury in a warnings case. And then the issue of using it, it's really more of a bystander claim in my mind. He wasn't using the product, regardless of what he was doing at the time. It's undisputed he was not using the cleaner. But that shouldn't foreclose a warnings claim if the product itself wouldn't have been on the premises. It's just like, for example, an asbestos case. Bystanders are exposed to asbestos. A sheet metal worker following an asbestos fireproofing insulator. They're not using the asbestos spray, but they're exposed to it through fiber drift. They still have a claim. Aaron Yakovich would still have a claim, too, even if he wasn't actually using this product at the time. He was in his vicinity. An accident occurred. He was injured as a result. And if additional warnings would have led a third party, in this case his employer, to get rid of the product or buy something safer, that should allow us to go to the jury on whether the inadequate warnings were a proximate cause of Aaron's injuries. Your Honor, in fact, you're saying that this product should never be used. If it is used, Your Honor, it ought to be used in a safer manner than it was in this situation. It wasn't used in a safer manner because Andrew Sawyer was not supplied a material safety data sheet, which would have told him to get eye protection, and the bottle's label itself did not mention eye protection. So nobody knew that goggles were necessary. Would he have had eye protection on at this time? He was all through. That's true, Your Honor. That very well may be the case, that in this situation, since he was all done, he may have already gotten rid of the eye protection. Actually, the second issue, which goes to our expert opinions, expert witnesses, admissibility, are the Daubert motions that were granted by the district court. One of the grounds on which our warnings expert was excluded were that he was not qualified to testify as a warnings expert. And if we do disagree with that decision, number one, Mr. Whitaker does have an extensive chemical engineering background dating back to 1955. He's worked for a number of different chemical companies. What's our standard in reviewing this? I believe it's for abuse of discretion, Your Honor. And so how did the court abuse its discretion? It abuses discretion by making decisions on the qualifications of Mr. Whitaker that really should have been left to the jury. I'm sorry, on his qualifications? On his qualifications, yes. Isn't the judge's role to act as a gatekeeper? How would the jury make a determination? Do you say they should just weigh, that's what you're suggesting, it goes to the weight and not the admissibility? I think that the district court needs to make a threshold preliminary decision. And at that point, once there is enough to show that Mr. Whitaker is qualified to be an expert, and we think he was under the case law. Well, I assume you do because you proffered him and thought he was a good expert. But sitting at our level, can you tell us in what respects the district court abused its discretion in disagreeing with your proffer? I think just, Your Honor, in not giving enough weight to Mr. Whitaker's background qualifications as a chemical engineer. He was on for purposes of establishing what a proper warning was? Right. He was our warnings expert. He was a chemical engineer. And so how did that chemical engineering background translate into what was a proper warning? Because this is a chemical burn case, and a chemical expert, particularly an engineer who understands product dynamics, who has worked with products for four decades as Mr. Whitaker has, is in the best position that I can think of to decide whether an industrial product like this, that contains chemicals that can burn, was properly labeled. I don't know of a better expert who has the chemical background to both identify the chemicals in this product. So was there a dispute by the time of trial that this solution could cause severe burns and blindness? No, Your Honor. That was undisputed. Okay. So if that's undisputed, what in his background would lead him to answer the question that you've properly focused us on today as to whether this label that was actually put on does its job with the public? It seems to me, if there's no dispute as to that, if it's stipulated in effect that it causes blindness, what does a chemical engineer tell us about labeling? Don't you need somebody who could talk about how consumers react to labels and that kind of thing? I don't think so, Your Honor. I think there's a lot of case law to the effect that engineers are great warnings experts, particularly in this case because Mr. Whitaker has an abundance of practical experience with warnings and safety instructions through the different companies that he's worked for since 1955. He's been extensively involved at every stage of his career until he became a full-time expert in developing safety instructions and employee instruction programs and things like that. He's consulted with corporations on what sort of warnings or literature they should be handing out to their employees or to consumers. Who did he assume, for purposes of his Crawford testimony, was the audience then? Was it people who are like employees who are being given handouts and that was what you were trying to get across? He was focusing on consumers, users of the product. Whether that was an employee or a nonprofessional retail purchaser, it was never really made clear with him. But that's a good point, Your Honor. It's even more important, since we're dealing with a workplace situation, to have someone who has this experience in dealing with workplace warnings. He didn't do very much drafting of warnings for products. I can only remember one that he did that for, whereas a product that was then sold, it was more the internal raw materials that were being used by these different companies. But it's the same thing, though, Judge. Whether it's a warning for a raw material that's only being used internally or for a consumer product, people need to know about these things. You may want to save what little time you have left for rebuttal. Thank you, Your Honor. Sure. Good morning, Your Honors. Good morning. Greg Como on behalf of the smart and final defendants, the retailers, as well as Carroll Company, the product manufacturer. Plaintiff in this case is making the novel claim that his injury was caused by an allegedly inadequate warning that he admits he never read on a product that he was not even using at the time. There actually is no factual dispute as to whether he read the warnings. It's undisputed that he did not read the warning either on the front label, which says danger causes severe burns, may be fatal if swallowed, or the identical warning on the back panel. Well, doesn't that raise a question, though? If this is a highly dangerous product, let's assume that, that causes blindness, and that isn't the prominent warning on the label, and the label, therefore, doesn't flag something like that, there are certainly ways to communicate. That's the purpose of a warning is to get people to read them. It is. When you say he didn't read it, one could react to that and say he didn't read it because you guys didn't make it prominent, so he couldn't avoid reading it, basically. The plaintiff has argued that the warning was not sufficiently prominent. However, that claim is rebutted for several reasons. Number one, the plaintiff did say that he read some of the instructions on the label,  So he makes the point, then, doesn't it, if he went to the trouble to read that and there was a big skull and crossbones or eyes with slashes across them or something, you don't think that would have gotten his attention and put him on notice and made him a lot more careful? There's nothing to suggest that it would have in this case because he was very selective about what he chose to read, and, in fact, even the instructions that he read, he ignored. He ignored an instruction to read all the precautions. He ignored a safety instruction to wear rubber gloves. He never wore rubber gloves. He admitted that. And he ignored the instruction to transfer the stuff into a spray bottle before using it. Was there evidence as to what would have happened if he'd spilled, if this, instead of hitting his eyes, the dosage that he got would have been to his hands? It could have burned his hands, depending on how long it was on. How severely? In other words, was it like the effect on his eyes that it would have maimed his hands? There's no evidence in the record on exactly what it would have done to his hands, and it probably depends on how long it would have been on his hands. In the case of hands without wearing gloves, he could have washed it off, but when it hit the eyes, there was no escape. Given the quantity that he got in his eyes in this situation, there wasn't. There's no evidence that if he had a smaller amount, it might have been able to wash it out more effectively. But it is undisputed that he not only did not read the warnings, but he ignored those that he read. And it's also undisputed that his employer did not read the warnings. And I want to correct a factual misstatement that the plaintiffs have made in this case. They claim that the employer testified that he did read the warnings. In fact, in our supplemental excerpts of the record, at page 55 of those excerpts, is Andrew Sawyer's testimony. And on page 19 of his deposition, he was asked very plainly, did you ever read the warning labels on the smart and final grill cleaner? And he answered no. Now, later on in the deposition, appellant's counsel tried to go back and suggest to him that he had testified that he did read the warnings. And this is at page 58 of the supplemental excerpts. I'm sorry, I have the wrong. Page 59 of the supplemental excerpts. And in the top right corner of page 68, he says, I think you testified that you did read the warnings on the bottle. And he says, I don't know. I can't recall. I remember I read the directions, but I'm not sure if I read the warnings. So the employer has not testified that he read the warnings. In fact, to the contrary. He waffled on it. He waffled. He did. But at first he testified that he didn't read them. So he certainly hasn't testified that he did read them. This is also undisputed. And counsel was unable to point to anywhere in the record to show that he was still using the product because it's undisputed that he wasn't. This did not occur while he was applying the grill cleaner to the grill. It did not occur while he was cleaning, scraping it off the grill. Instead, what happened was he put it on. He walked over to a shelf that's 10 feet away from the grill, put it on the shelf, got the vinegar off, put the vinegar on, wiped the vinegar off. And now we're about 10 minutes later. He goes back to the shelf 10 feet away. And as he's preparing to leave the restaurant for the night, the bottle falls off of the shelf. So they put it up where it could be dislodged. I come back to the point that troubles me about this case is what you say about not reading the labels and the like. To some extent, if people know what they're dealing with is highly injurious, and if it were a bomb, people are going to treat that differently if they're made unalterably and unavoidably aware of it. And the tension in this case is that, as you acknowledge, what happened is that he got hit in the eye, a very vulnerable part of the body, through an accident. And the question is, if they had been given a warning that says, you know, this stuff is really dangerous, don't store it where it can get knocked off, don't keep it, you know, put it down somewhere where it's out of the way, handle it with kid gloves, whatever, then that would modify somebody's behavior. And I'm trying to understand, in this case, given the apparent toxicity of this for the eye, why that wasn't more prominently featured on this product. Well, I can address the specific question about the eye. This label is governed by the Federal Hazardous Substances Act, and they have a sample label that the CPSC publishes, and this label is identical to that label. The warning, danger causes severe burns, is a broader warning than singling out a particular body part that could be burned. For example, it doesn't say if you get it in your mouth, it will burn your mouth and your throat. It does say may be fatal if swallowed, but it doesn't specify that it could burn the inside of your mouth. It doesn't say if you get it up your nose, it could burn the inside of your nose.  If it burns, wouldn't people know that that's likely to cause them severe internal injury? So why don't they just simply end it with may cause severe burns? I think you could argue that that warning itself is redundant, although the risk of fatality, I think, causes the need for that warning. But arguably, that's a redundant, in light of the danger causes severe burns. I understand your argument that it's essentially a copy of the CPSSA model label, but that's not a cast in stone. What was that model for? Was it a model for a particular kind of this product? It was a model for products containing 5 to 10 percent sodium hydroxide, which this one does, and it even suggests that it would apply to cleaner type products. This is at page 47 of the supplemental excerpts of record. It references add, use rubber gloves when appropriate, and then it says, in parentheses, oven cleaners, et cetera. So certainly this sample label is envisioned for products like this particular one, which is an oven and grill cleaner. If you look at the statute that the Federal Hazardous Substances Act, the warnings under that, which are at 15, 12, 61, P1, the nature of the warnings that they recommend and that the CPSC uses in its sample label are broader warnings such as causes severe burns. For example, they use warnings like vapor harmful, causes burns, absorbed through skin, or similar wording descriptive of the hazard. And this is the same type of language that CPSC picks up and uses in its label. And I think the concern here is that they don't want to go and list every single body part that might be harmed by a product. Instead, they want to focus on the risk of injury and put it in broad terms so people understand that it could burn the skin, the eyes, et cetera. The plaintiff's own expert admitted when asked about the warning causes severe burns, wouldn't people understand that that would include the eyes, and he said yes. In fact, the plaintiff himself admitted in his deposition when he finally read the warning, he admitted that he understood that that language means that it could severely injure your eyes. The problem isn't with the language. It's the failure to read the warnings, and that's something that you can only do so much with. You can't force somebody to read a warning, and we all know from practical experience that sometimes warnings are not read. As far as the conspicuousness of the warning. You pay a lot of money to your public relations people or publicists to change that behavior. I'm sorry. An element of what this warning is all about. That's correct, Your Honor. I'm not suggesting that no warning should have been given. What I'm suggesting is that when you give an adequate warning and the person doesn't take the time to read it, the manufacturer is not responsible for that, and that's what the case law holds in Arizona, the Gossowich case in particular. As far as the conspicuousness, I would like to address that, because the conspicuousness and prominence, for example, this going crossbones idea, is something that is governed by the FHSA. So if you find that the FHSA applies to this case and this label, then that preempts any argument that the conspicuousness should have included things other than what's suggested in the regulations. They would still have a failure to warn claim if they could show that this label violated the regulations or statute in some way, but that's their only avenue. And on that they have no evidence that this was. Is there a standard for products that cause blindness? Is there some symbol? The regulations don't require any kind of graphic symbol that was admitted to by Gordon Waver. But if the primary hazard is blindness on a product, is there a standard for that that's in the record? No, there's no specific standard for that under the regulations. They don't regulate the content as specifically as they regulate the conspicuousness and prominence issues. On those issues they talk about the type size, the color contrast, and all of that. And we came forward with evidence that our label complied with all those requirements, and they came forward with really nothing to rebut that. And so that's why the court found that the conspicuousness and prominence issue would be preempted anyway. So I do want to touch on the regulation. Is this product governed by the Federal Hazardous Substances Act? Clearly it is. The Canty case, Canty v. Everlast, is what the district court said is exactly on point. That was a case involving a lacquer seal where it was primarily marketed to people, tradespeople, but it was available in retail stores where the general public could come in and purchase it. Just as in this case, the oven and grill cleaner is sold in what's really more like a supermarket store rather than a warehouse store. There's products on the shelves that's open to the general public. Anybody can come in and shop there. Anybody can purchase any of the products there, including the oven and grill cleaner. This product is sold and can be used to clean one's oven at home. So it's virtually identical to the case involving the lacquer seal that the Canty case held was governed by the Federal Hazardous Substances Act. The two cases that plaintiff relies on, one was burning alcohol that was strictly prohibited to be sold by policy to anyone other than dentists. Now it seemed like somebody got their hands on it, but their policy of the store that was selling it was to strictly prohibit sales. The other product was a cleaning, in the Christensen case, was a cleaning liquid cleaner that was used in high-powered washing machines to clean surgical equipment. It was sold only to hospitals. And in those cases, the courts held that that's not something that's reasonably foreseeable. In contrast, the Canty case is much closer to the facts of this case as the district court. I think we have your briefs. We have your cases. And the other point is the expert, as far as the exclusion of the expert, the court was within its discretion in excluding Gordon Whitaker. He's never drafted a warning label for anything other than litigation, and he's never been trained in that. So he's he was not qualified. And his opinions were really ad hoc opinions that weren't based on any scientific testing done by him or anyone else. They weren't based on peer reviewed literature. He essentially decided that the label was insufficient and then went out and looked for standards here and there to support his opinions. I think we have that in your brief. If there's any other questions. One of the peculiarities of the case to me is this. Apparently, a lesser warning is required if there's something that's being sold for household use and a greater warning if it isn't. I don't know that I would agree with that. I just think that the warnings are regulated under different informed forms. When it's sold for household use, it's the Consumer Product Safety Commission that applies and they they regulate the warnings in that situation. It's a statutory scheme and that's done to ensure uniformity. But in the peculiarities of this case, the plaintiff is arguing that a greater warning is is required because this is is not sold for commercial, for household purposes. And you're in effect saying that the lesser warning is is required because it's regulated by statute. Now, if it is sold for household use and apparently, as I get it, this is in some retail stores. And yet, apparently, if that's the case, a lesser warning is enough. Well, I would say that it's not really a lesser warning because I believe that this warning would satisfy a common law standard in Arizona, too. But it's true. It's under the scrutiny changes to the federal statute and the regulations. And I think it is somewhat ironic in this case that the plaintiff is claiming that a statute that's designed to protect them doesn't apply. And the reason is because the fact is this label does satisfy the statutory requirements. And so in order to deal with that problem, they have to argue that the statute doesn't apply. If there are no further questions, then. Judge Gibson? No further questions. OK. Thank you, judges. We'll give you a minute to wrap up. Just one point I wanted to touch on, Your Honors, that I didn't highlight during my opening argument. And that's the issue of whether Aaron's failure to read the label that was on the bottle precludes his warnings claim. And we definitely believe it does not. Under the Arizona Court of Appeals decision, and as well as the vast majority of cases, failure to read a warning does not foreclose a warnings claim when the plaintiff alleges that the presentation of the warnings were deficient, which we have done in this case. We've attacked both the warning substantively in content as well as in its presentation. So we think that our arguments regarding the label's presentation allow us to get to the jury on the warnings claim, regardless of whether Mr. Yakovitch read the label. And that the issue of whether a greater warning, more detailed warning, or a more prominently displayed warning would have changed anything in this case, would have been read by Aaron and Mr. Sawyer, or would have changed their conduct in any way, I believe is a question for the jury. There's competing evidence on this point. Mr. Sawyer did testify at one point in his deposition that he did read the warning and that a blindness warning would have changed his conduct and led to the exclusion of that product from the workplace. Mr. Yakovitch submitted an affidavit in which he said that he would have read the sample of hose labels. I think given that, Your Honors, that's a jury question on credibility. That should not have been determined by the district court. It should have been submitted to the jury for fact determination. Excuse me, just one question. Is there anything that prevents this product from being sold on a retail basis to household use? No. Thank you. Judge Gibson? I have no questions, but I wonder if we might have about a one-minute recess before we hear the last case. Well, this is California, so we'll give you five minutes. Five minutes is okay. Well, you don't know where to find me. Well, we can take ten, but we'll try to be tactful. Really, two is plenty, but five is good. Well, we'll do five. I think so.
judges: Hug, Gibson, Fisher